IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

NANCY GOLDING,

        Plaintiff,

                                         09-CV-967-ST

    v.

COMMISSIONER OF THE SOCIAL           OPINION AND ORDER
SECURITY ADMINISTRATION,

        Defendant.

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Nancy Golding ("Golding"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI and Disability Insurance Benefits ("DIB") under Title

1 - OPINION AND ORDER

II of the Social Security Act ("Act"), 42 USC §§ 401-33.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3).  All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).  For the reasons set forth below, the Commissioner's decision is affirmed.

## ADMINISTRATIVE HISTORY

On March 9, 2005, Golding filed applications for DIB and SSI alleging disability as of June 30, 1999, due to bipolar disorder and an intestinal disorder.  Tr. 69-74, 81.  She met insured status requirements for Title II through December 31, 2001.  Tr. 19.  After her claims were denied initially and upon reconsideration, she timely requested a hearing before an administrative law judge ("ALJ").  On May 4, 2007, Golding and an impartial vocational expert appeared and testified before ALJ John Madden, Jr.  Tr. 456-82.  The ALJ issued a decision on July 23, 2007, finding Golding not disabled under the Act.  Tr. 17-31.  Golding timely requested a review of the ALJ's decision.  Tr. 13.  On June 26, 2009, the Appeals Council denied her request for review, making the ALJ decision of July 23, 2007, the Commissioner's final decision.  Tr. 7-11.

## BACKGROUND

Golding was 30 years old at the time of the hearing.  Tr. 461.  She dropped out of high school in the ninth grade and never obtained a GED.  *Id*.  In the past she worked as a caretaker for a disabled person.  Tr. 82, 99-103.  She has three children, the oldest of whom was removed from her care by child services.  Tr. 294, 362.  The younger son and daughter live with her.  Tr. 468.

On a typical day, Golding wakes at 6:00 a.m. with her children. After the children do homework and head off to school, Golding tidies the house and plays with her dogs, cats, and snake. Tr. 115, 119, 364. She washes dishes, does laundry, vacuums, and watches television. Tr. 115, 117. She bathes and feeds herself and her children. *Id.* Once a week she shops for food, clothes, and animal supplies. Tr. 118. Golding regularly visits her father's house, her friend's house, and stores. Tr. 119.

Golding believes she has irritable bowel syndrome ("IBS")[1] caused by stress which physically prevents her from working. As she explained:

> When I am stressed out enough for my intestines to act up, I can't leave home. I'm pretty much bedridden. I'm doubled up in pain. Walking to the bathroom is difficult. . . . When I'm under treatment and I have no stress, then I am controlled. But if I have simple things –a boyfriend in my life, trying to get up on a regular basis to go to work, putting my face out in public and meeting people that I don't know–after a few weeks I become dysfunctional. I stop eating. I stop sleeping. I start having severe diarrhea and abdominal cramps and it leads me into getting sick.

Tr. 464-65.

According to Golding, her IBS symptoms occur daily and tend to flare for "two to six weeks at times. . . . If I live in complete solitude where there is no stress, then I would say I have a four-or five-day issue a month." Tr. 486-87. Although Golding attributes her IBS to stress, she also reported "that her abdominal symptoms and many of her physical symptoms are related to the meth use." Tr. 207.

---

[1] "IBS is an abnormal condition of gut contractions (motility) characterized by abdominal pain, bloating, mucous in stools, and irregular bowel habits with alternating diarrhea and constipation, symptoms that tend to be chronic and wax and wane over the years. Although IBS can cause chronic recurrent discomfort, it does not lead to any serious organ problems. Diagnosis usually involves excluding other illnesses." http://www.medterms.com/script/main/art.asp?articlekey=5638 (last accessed on August 24, 2010).

3 - OPINION AND ORDER

On October 6, 2004, Golding was evaluated by Maciey Druzdzel, M.D., for IBS symptoms. Tr. 404-05. Dr. Druzdzel prescribed medical marijuana and referred Golding for a gastroenterology evaluation. Tr. 405. On January 5, 2005, Golding saw Cynthia Hutton, M.D., at Gastroenterology Consultants P.C. for a physical and stool samples to evaluate her irritated bowels. Tr. 411. The stool samples "came back normal" and the clinic determined that "she probably does not need any further work-up from our office." Tr. 214, 441. A December 15, 2005, MRI of Golding's abdomen was an "[u]nremarkable study, except for incidental synodical cyst arising posteroinferiorly from the facet joints of L2-3 and L4-5 on the right." Tr. 346. Nevertheless, she tells doctors that "[s]he has a long-standing history of irritable bowel syndrome – she was first diagnosed when she was 16 or 17 years old." Tr. 207. Golding takes multiple homemade marijuana capsules and smokes ten bowls of marijuana per day to treat her IBS. Tr. 467.

Golding has a number of mental health diagnoses and has attended therapy occasionally. In 2005, she met with Licensed Clinical Social Worker Malia Delohery-Dart on several occasions. According to Ms. Delohery-Dart, Golding "is extremely vague about her mental health symptoms. She states she was diagnosed with Bipolar Disorder years ago in Arizona, but the records we received from Arizona have her listed" with Depressive Disorder, Social Phobia, and Cannabis Dependence. Tr. 314. Ms. Delohery-Dart pointed out that "[s]ocial Phobia is a very common side effect of long term cannabis dependence." *Id.* She also noted that Golding "has mentioned to me that she would like to get on disability. The word is definitely out that there [*sic*] Bipolar Disorder is one of the diagnoses that qualifies for disability. She seems amused when discussing her mental health symptoms." *Id.* Ms. Delohery-Dart diagnosed

4 - OPINION AND ORDER

Golding with Depressive Disorder, Polysubstance Dependence, and Borderline Personality Disorder. *Id.*

Golding's mental health treatment with Curry County Human Services terminated on January 20, 2006, due to noncompliance and because she "never engaged in treatment in any meaningful way & seemed alternately bored or amused with the treatment process." Tr. 293. At that time, Ms. Delohery-Dart wrote:

> She initially presented for treatment stating she'd been diagnosed with Bipolar Disorder & wanting me to help her get Social Security. . . . In treatment, Client never engaged in any way. . . . After I discussed with Client the fact that I did not see any symptoms of Bipolar Disorder & that applying for Social Security was a 3-5 year process, she seemed not to understand what we were doing in therapy.

Tr. 294.

On April 19, 2006, Golding was admitted to Curry General Hospital after taking 10 Zyprexa, purportedly in an effort to kill herself. Tr. 324. She later reported that she did this because she was extremely frightened of an abusive boyfriend. Tr. 363.

\      On September 22, 2006, Golding met with Jean Hale, Ph.D., for a psychological assessment. Dr. Hale did not review any medical records in conducting the assessment, but interviewed Golding for five hours and administered an MMPI-2 test. As a result, Dr. Hale wrote:

> Ms. Golding's response pattern on this administration of the MMPI-2 is consistent with those of people who are greatly exaggerating their symptoms. Her responses are unusual even compared to those of people who are inpatients on psychiatric wards. Were she to be experiencing this level of pathology, it would have been apparent during the interview. This MMPI-2 could be considered invalid. However, there is information to be gleaned from her responses. . . . Her responses are consistent with those of people who tend to convert emotional stress into physical symptoms. . . . Gastrointestinal distress and Irritable Bowel Syndrome are frequently

5 - OPINION AND ORDER

>associated with emotional distress. . . . People with similar MMPI-2 profiles tend to function at a reduced efficiency even though they are not incapacitated by major illness.

Tr. 365.

Dr. Hale diagnosed Golding with Somatoform Disorder, PTSD rule out Anorexia Nervosa and Obsessive Compulsive Disorder, and Schizotypal Personality Disorder, and assessed a GAF score of 65. Tr. 366. Dr. Hale also opined: "Given her discomfort around people and her distractibility, it is unlikely that she could function in a work environment." Tr. 365.

Mental health issues aside, Golding has a long history of drug use. She has smoked cigarettes since she was 11 years old. Tr. 208. When Golding was a teenager, she inherited $190,000 and spent it all on methamphetamine. Tr. 466. Golding acknowledges she had a methamphetamine problem as a teenager, but testified that she has not used it since she was 17 years old. *Id.* In a psychiatric evaluation on October 10, 2005, however, Golding reported to Professional Mental Heath Nurse Practitioner Sarah Williams that she had last used methamphetamine five years earlier in 2000 at the age of 24. Tr. 308. In September 2005, however, Golding told Ms. Delohery-Dart that she had last used methamphetamine nine months earlier in January of 2005. Tr. 314. Ms. Delohery-Dart summarized Golding's drug history as follows:

>Again, I want to document my concerns about this client being a drug-seeker . . . . She has two ex-husbands who are incarcerated on drug charges. Nancy has a 15-year history of daily marijuana use. Now she has that marijuana use legalized because she has a medical marijuana card. She has a 6-year history of methamphetamine use – and reports her last use was 9 months ago. She reports frequent use of alcohol and that she "drank every day for a year" but cannot remember exactly what year that was. Even though she has a medical marijuana card, I am referring her to

6 - OPINION AND ORDER

>	our Alcohol and Drug Treatment program as part of her treatment with me
>	due to this extensive poly-substance history. It is unclear to me why
>	someone who uses 6-8 capsules each day of cannabis needs more
>	medication to "calm her down." She has decided medical marijuana is her
>	primary medication for her physical and mental health ailments so I am
>	not even sure what medications she is requesting. She has specifically
>	mentioned Klonopin, however.

Tr. 314.

## DISABILITY ANALYSIS

The Act provides for payment of DIB to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 USC § 423(a)(1). In addition, SSI may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 USC § 1382(a). In construing an initial disability determination, the Commissioner engages in a sequential process encompassing between one and five steps. 20 CFR §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii). Absent a severe impairment, the claimant is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If the adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id.* If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 404.1566, 416.966..

## ALJ'S FINDINGS

At step one, the ALJ concluded that Golding has not engaged in substantial gainful activity since the alleged onset date of June 30, 1999. Tr. 20.

At step two, the ALJ determined that Golding suffers from the severe impairments of depressive disorder, cannabis dependence disorder, history of methamphetamine abuse, and a learning disability in the area of mathematics. Tr. 20.

At step three, the ALJ concluded that Golding's impairments, including substance use disorders, meet sections 12.04 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1. Tr. 24. The ALJ found, however, that if Golding stopped the substance abuse, she would still have a depressive disorder but would not have an impairment that meets or medically equals any listed impairment. Tr. 26. Absent substance abuse, Golding would have an RFC that would allow her:

> to perform a full range of work at all exertional levels, with the following nonexertional limitations: the claimant has moderate limitations in her ability to understand, remember, and carry out detailed instructions, moderate limitations in her ability to work in coordination with or proximity to others without being distracted by them; and moderate limitations in her ability to interact appropriately with the general public. She can work with the general public and coworkers on an occasional basis. She can adapt to minor changes in the work setting. She has a learning disability in math. Work should be learned by demonstration. She needs clear goals to be outlined. Her work should not require a lot of paperwork. The claimant may do best in a position where she can get support from a peer mentor when needed. A competitive work setting and competitive schedule is precluded.

Tr. 27-28.

Based on the above limitations, the ALJ concluded at step four that Golding cannot perform any past relevant work (Tr. 29) and at step five that she can perform work as a hotel cleaner, laundry sorter, or folding machine operator. Tr. 30-31.

Accordingly, the ALJ concluded that Golding was not disabled. Tr. 31.

///

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir

2004). Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance. *Bayliss v. Barnhart*, 427 F3d 1211, 1214 n1 (9th Cir 2005). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). However, it may not substitute its judgment for that of the Commissioner. *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## DISCUSSION

Golding assigns three errors to the ALJ's decision: (1) the ALJ improperly failed to find her IBS to be a severe impairment; (2) the ALJ improperly rejected the opinion of the examining psychologist, Dr. Hale; and (3) even under the ALJ's RFC, she is disabled.

### I.    Irritable Bowel Syndrome

Golding initially reported to the SSA that she could not work because she has bipolar disorder and an intestinal disorder. However, the record contains no evidence that Golding has either disorder. Instead, as to physical impairments, Golding now argues the ALJ committed reversible error by failing to find that she suffers from the severe impairment of IBS.

A medically determinable impairment must be established through signs, symptoms, and medically acceptable clinical or laboratory findings, but under no circumstances can it be established through symptoms, namely the individual's own perception of the impact of the impairment, alone. *Ukolov v. Barnhart*, 420 F3d 1002, 1005 (9th Cir 2005). In addition to

10 - OPINION AND ORDER

subjective symptoms, there must be objective medical evidence such as anatomical, physiological, or psychological abnormalities that can be observed apart from the plaintiff's statements of symptoms and that are shown by medically acceptable clinical and laboratory diagnostic techniques.  20 CFR §§ 404.1528(b)-(c), 416.928(b)-(c).

Here the record contains no objective basis to conclude that Golding has IBS or any other physical impairment.  The IBS diagnosis is based completely on Golding's own reports of her symptoms.  Dr. Druzdzel seemed to accept Golding's report of IBS without any objective verification of the disorder.  In his report of his first visit with Golding on October 6, 2004, Dr. Druzdzel wrote:  "Interested in Medical Marijuana. . . . History of . . . irritable bowel syndrome."  Tr. 404.  In the "objective" section, he wrote:  "abd: nondistended.  Soft, nontender.  No masses palpable.  No hepatomegaly.  No peristaltic sounds.  No CVA tenderness to punch."  Tr. 405.  Nevertheless, he prescribed medical marijuana and sent Golding to Gastroenterology Consultants P.C. for analysis of her abdominal pains.  *Id.*  The gastroenterology clinic tried repeatedly to get in touch with Dr. Druzdzel about its lack of objective findings to substantiate Golding's symptoms, but he never responded.  Tr. 411.  The radiologist who performed a CT scan of Golding's stomach on January 17, 2005, made no mention of IBS.  Tr. 210.  Paul Coelho, M.D., a spinal expert who Golding saw for back pain on December 12, 2005, opined that:  "It sounds as if this may be irritable bowel syndrome."  Tr. 359.  However, he found no objective indicators to substantiate IBS and did not actually make a diagnosis.  *Id.*

Simply put, the record contains no objective medical findings to support a diagnosis of IBS or any other physical ailment that would explain Golding's abdominal pain.  Therefore, the ALJ did not err when he determined that Golding's purported IBS was not a severe impairment.

11 - OPINION AND ORDER

## II.  Examining Psychologist's Testimony

Golding argues that the ALJ erred by improperly rejecting the opinion of Dr. Hale that she has a somatoform disorder and is unlikely able to function in a work environment.

The weight given to the opinion of a physician depends on whether the physician is a treating, examining, or nonexamining physician. More weight is given to the opinion of a treating physician who has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue*, 495 F3d 625, 632 (9th Cir 2007). If an examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Widmark v. Barnhart*, 454 F3d 1063, 1067 (9th Cir 2006). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F3d at 632; *Widmark*, 454 F3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F3d at 1066 n2.

In this case, the ALJ only gave "very limited weight" to the opinion of Dr. Hale, an examining psychologist. Tr. 23. The ALJ did not adopt her diagnoses of somatofrom disorder and post traumatic stress disorder because Dr. Hale had an incomplete drug use history from Golding, had no medical records to review, had no information that other mental health providers were concerned with Golding's drug-seeking behavior, and only met with Golding once for five hours. *Id*. The ALJ also reasoned that Golding's other treating mental health providers, who saw her over a long period of time, did not diagnose somatoform disorder. *Id*.

12 - OPINION AND ORDER

Golding objects to the ALJ's reliance on the opinions of treating providers, such as Ms. Williams and Ms. Delohery-Dart, who are not "acceptable medical sources" as defined in 20 CFR 404.1513(d) and 416.913(d) and SSR 06-3p. However, such treating providers are considered "other sources" whose opinions are "important and should be evaluated on key issues such as impairment severity and functional effects." *Id*; *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). Those "other sources" opined that Golding's marijuana use likely contributed to her social anxiety and other reported psychiatric symptoms, including sleep difficulties, depression, and mood instability. Tr. 21, 202, 310-11. They also advised that she abstain from using marijuana while using psychotropic medications for treatment of her mental health conditions. Tr. 26, 287.

The issue is not whether Dr. Hale was correct, but whether the ALJ provided clear and convincing reasons for not adopting her diagnoses. The court finds that the discrepancy between the opinions of Dr. Hale and other mental health providers (Tr. 194, 293), the lack of longitudinal medical records to review, and the incomplete drug history provided by Golding to Dr. Hale together constitute clear and convincing reasons supported by the record as to why Dr. Hale's diagnoses need not be accepted in their entirety. Accordingly, the ALJ did not err by giving only partial weight to the findings of Dr. Hale.

### III.    Residual Functional Capacity

The ALJ found in the RFC that "[a] competitive work setting and competitive schedule is precluded." Tr. 28. Golding argues that under the Commissioner's policy statements, this finding precludes Golding from being able to work.


Golding points to the Social Security Administration's Program Operation Manual System ("POMS") which provides guidance on evaluating the mental capacity to do unskilled work. Under the POMS, a finding of disability may be justified if an individual has a substantial loss of ability to meet the mental demands of unskilled work. The POMS gives the following guidance about what entails "substantial loss:"

> In practical terms, an individual has a substantial loss of ability to perform a basic mental activity when he-she cannot perform the particular activity in regular, competitive employment but, at best, could do so only in a sheltered work setting where special considerations and attention are provided. This requires professional judgment, on the basis of the evidence in file in each case.

POMS DI 25020.010A.3.b.

This POMS guideline does not mandate a finding that Golding is disabled for several reasons. First, it relates to an ALJ's determination of whether a claimant has experienced a substantial loss of the ability to meet the mental demands of unskilled work. The ALJ was not seeking to answer this question when he included the "competitive work setting" language in the RFC. Second, "the POMS does not have the force and effect of law." *Williams v. Astrue*, 324 Fed Appx 618, 619 (9th Cir 2009). Therefore, it is not binding on the ALJ. Third, the POMS guideline expressly requires the ALJ to use his or her professional judgment about whether the claimant can meet the mental demands of unskilled work based on the evidence in each case. There is every indication the ALJ did so in this case.

Finally, the ALJ's inclusion of a limitation regarding competitive work settings and schedules is not a statement about Golding's inability to meet the mental demands of unskilled work. It follows on the heels of a statement that Golding "may do best in a position where she

can get support from a peer mentor when needed." Thus, it appears to clarify the type of work environment that Golding needs, rather than a statement that she is not competitively employable. The ALJ expressly addressed Golding's mental capacity by stating that she "has moderate limitations in her ability to understand, remember, and carry out detailed instructions; moderate limitations in her ability to work in coordination with or proximity to others," *etc*. Tr. 27. Moreover, the ALJ appropriately considered many factors in the record in arriving at the RFC. Tr. 28-29.

Golding also asserts that the VE's testimony lacks evidentiary value because the ALJ did not include unspecified limitations from Drs. Hale and Druzdzel or a severe limitation for IBS. However, Golding does specify what limitations by Drs. Hale and Druzdzel the ALJ failed to address, and any IBS limitation was unnecessary given the lack of objective medical findings to verify the existence of IBS.

///

///

## ORDER

For all of the reasons discussed above, the ALJ did not err by finding Golding not disabled if she stopped her substance abuse. Thus, the decision of the Commissioner is affirmed.

DATED this 24th day of August, 2010.

                                            s/ Janice M. Stewart_____
                                            Janice M. Stewart
                                            United States Magistrate Judge